## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**TANYA WASHINGTON,**

     **Plaintiff,**

**vs.**                                **Case No. 1:11cv209-CAS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

     **Defendant.**

_____/

## <u>MEMORANDUM OPINION</u>

This is a social security case referred to me upon consent of the parties and reference by District Chief Judge M. Casey Rodgers.   Docs. 8 and 14.   It is concluded that the decision of the Commissioner should be affirmed.

**I.   Procedural status of the case**

Plaintiff, Tanya Washington, applied for a period of disability and disability insurance benefits with onset on May 27, 2008.   R. 10, 174.   (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   Her last date of insured status for disability benefits is March 31, 2013.   R. 12.

Plaintiff was born in 1970 and has a 12th grade education.   R. 169.   In her Disability Report, Plaintiff alleged disability due to mental illness, depression, chronic hypertension, Post-Traumatic Stress Disorder (PTSD), and fibromyalgia.   R. 174.   Plaintiff's past relevant work included work as a medical records clerk, payroll clerk, customer service representative, and receptionist.   R. 19.

Plaintiff's claim was denied initially on June 19, 2009, R. 60-62, and on reconsideration on November 5, 2009.   R. 66-67.   On December 8, 2009, Plaintiff requested a hearing.   On February 8, 2011, the evidentiary hearing was conducted by video hearing (at Plaintiff's request) with sites in Ocala, Florida, where Plaintiff appeared, and the ALJ appeared at the Jacksonville, Florida, site.   R. 26, 28.   Plaintiff was represented by a non-attorney representative.   R. 10.   Jackson McKay testified as a vocational expert (VE).   R. 10, 47-51.

On March 18, 2011, the ALJ entered his Decision concluding that Plaintiff is not disabled.   R. 21.   Plaintiff seeks judicial review of this Decision.   Both parties filed memoranda of law.   Docs. 11 and 15.

## II.  Legal standards guiding judicial review

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.   Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208,

1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).

"If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."   42 U.S.C. § 423(d)(1)(A).   Both the "impairment" and the "inability" must be expected to last not less than 12 months.   Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.   20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.   Phillips, 357 F.3d at 1239; Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

An ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert.   Phillips, 357 F.3d at 1239-40.   "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."   Wilson v. Barnhart, 282 F.3d at 1227.   *See also* Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).   However, the ALJ is not required to include findings in the hypothetical that the ALJ has properly rejected as unsupported.   *See* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004); McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

## III.  Findings of the ALJ

In his Decision, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff has not engaged in substantial gainful activity since May 27, 2008. R. 12.

2. Plaintiff "has the following severe impairments: affective mood disorder and post-traumatic stress disorder (PTSD)."  R. 12.

3. Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 12-14.

4. Plaintiff has the residual functional capacity (RFC) "to perform a full range of work at all exertional levels but with exertional limitations" and specifically "limited to simple, routine, repetitive tasks involving up to three-step commands" and "further limited to work requiring only occasional changes in work setting and decision-making" and, "limited to work requiring only occasional interaction with the general public or co-workers."  R. 14-19.

5. Plaintiff "is unable to perform any past relevant work" "as actually and generally performed."  R. 19.

6.  "Considering [Plaintiff's] age, education, work experience, and [RFC], there are jobs that exist in the national economy that [Plaintiff] can perform," such as cleaner, laundry sorter, and kitchen helper, which are unskilled jobs.   R. 20.

## IV.  Issue

Plaintiff argues that the ALJ erred by not asking the vocational expert, Mr. McKay, a hypothetical question which included all of Plaintiff's limitations including the limitations set forth in the ALJ's Psychiatric Review Technique (PRT) limitations findings, such as *moderate* difficulties in maintaining social functioning and *moderate* difficulties in maintaining concentration, persistence, or pace as well as all of the limitations arising out of Plaintiff's severe depression (affective mood disorder) and PTSD.

## V.  Evidence

### Medical and other evidence

Plaintiff does not disagree with the factual findings derived from the medical and other evidence submitted to the ALJ during the evidentiary hearing.   *See* Doc. 11. Rather, Plaintiff disagrees with the weight given to the evidence and the conclusions reached by the ALJ regarding whether Plaintiff can perform the jobs described by the VE and found by the ALJ, R. 19-20, in light of the alleged deficient hypothetical question posed to the VE, which, according to Plaintiff, omitted critical impairment factors.

Medical and other evidence presented to the ALJ is set forth in the ALJ's Decision at pages 14 through approximately the first half of page 16 and is set forth below.   Doc. 9-3 at 14-16.   Plaintiff's testimony at the hearing is summarized by the ALJ on pages 16 and 17 of his Decision.   Doc. 9-3 at 16-17.

After determining that Plaintiff has not engaged in substantial gainful activity since May 27, 2008, and that Plaintiff has two severe impairments, i.e., affective mood

disorder and PTSD, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.   R. 12.   The ALJ analyzed this issue in light of Listing 12.04 (affective disorders).   Listing 12.04 is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.   Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.   The required level of severity for these disorders is met when the requirements in both [paragraphs] A and B are satisfied, or when [paragraph] C are satisfied."   20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04.   At least two of the four listed criteria must be satisfied: marked restriction of activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.   *Id.*

The ALJ found that Plaintiff had mild restriction of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation, which have been of an extended duration.   Therefore, the ALJ found that the paragraph criteria were not met.   Based on his review of the medical record, the ALJ also found that Plaintiff's mental impairment did not satisfy the paragraph C criteria of the mental listing.   R. 13.

Nevertheless, the ALJ stated that the paragraph B criteria are not a RFC

assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.   The mental [RFC] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders in 12.00 of the Listing of Impairments (SSR 96-8p).   R. 13.

Therefore, the ALJ stated that his RFC "assessment reflects the degree of

limitation [he] has found in the 'paragraph B' mental function analysis."   R. 13.

In light of this framework, the ALJ made findings regarding Plaintiff's RFC

following a two-step process, to wit: whether there is an underlying medically

determinable physical or mental impairment(s) that could reasonably be expected to

produce the Plaintiff's pain or other symptoms and, if so, whether the intensity,

persistence, and limiting effects of Plaintiff's symptoms limit Plaintiff's functioning.   At

this point, the ALJ discussed the relevant medical and other evidence presented.

R. 14.

> The record reveals a difficult history with childhood sexual abuse.   In addition, the claimant was abused by an assistant principal in high school, raped by her platoon Sergeant while serving in the military in 1989 and encountered sexual harassment during recent employment.   The claimant's record reveals treatment in 2007.   A December 4, 2007, entry from the VA notes the claimant's "on and off" cocaine use for 17 years, and statement that she "only uses it when she goes out with friends on the weekend."   In addition, it noted the claimant "reported that she has her mom and brother at home who are supportive."   A drug screen test was positive for cocaine.   A December 19, 2007, assessment by Nancy Detweiler, LCSW, noted the claimant's concentration and abstraction were within normal limits, and that she was able to understand problems, verbalize solutions, and understand her treatment plan.   It was also noted her "back [sic] check charges are of some concern."   Ms. Detweiler concluded her GAF score was 60.   Based on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Text Revision (DSM-IV-TR), a GAF of 60 constitutes moderate, almost mild, symptoms or difficulty in social, occupation or school functioning (Exhibits 1F, 11F, and 12F).
>
> The claimant's treatment in 2008 reveals she is not as impaired as alleged.   A February 13, 2008, entry noted the claimant had no suicidal ideation or thoughts of harming herself (Exhibit 1F).   A February 20, 2008, entry noted the claimant "said she continues to work and was successful in setting limits for her boss." An August 20, 2008, entry by Billie Warren, Ph.D., noted the claimant's GAF score for PTSD was 60, her PTSD described as moderate, her remote and immediate memory was normal, her recent memory was mildly impaired, and that there was no problem with her daily living activities.   Further, Dr. Warren noted the claimant could maintain her personal hygiene, had an unremarkable

thought process, understood the outcome of her behavior, and had no delusions. A September 10, 2008, entry noted the claimant would "arrange fro [sic] her mother to lend her the car" and that the claimant would attempt to secure a bus pass as an alternative means of transportation.   A December 1, 2008, entry noted the claimant was currently living with her family, and that she was hearing voices telling her to jump from a 6th floor balcony, but also noted she "has no current suicidal or homicidal thoughts of feelings" (Exhibits 1F and 4F).

Though the claimant continued treatment in 2009, that treatment also reveals she is not as impaired as alleged.   An April 9, 2009, entry noted the claimant "is close geographically and emotionally to her mother and has had more satisfying conversations with her since she has not lived under her room."   A May 7, 2009, entry noted the claimant uses marijuana "sometimes."   Heather Manor, a psychology postdoctoral fellow, diagnosed the claimant with a GAF of 62, and moderate depression.   According to the entry, Jason Burns, Ph.D., read the entry and agreed with its findings (Exhibit 1F).   In June 2009, the claimant dropped her summer courses.   It also noted the claimant "plans to reenroll in school in the fall and will have a paid work experience at the VA.   She looks forward to this."   A July 13, 2009, entry noted the claimant had to be brought to an appointment by Ms. Detweiler because she was too depressed to get out of bed.   On July 17, 2009, Jose Llinas, M.D., concluded the claimant's GAF score was 69, but labeled this "moderate to severe symptoms."   A July 20, 2009, entry noted the claimant "looks in good spirits, in control of herself, and much improved from her depression, so much so and so quickly, it makes me wonder about whether she is truly bipolar or mostly unipolar depressed."   It also noted the claimant had no problems with her medications, "onlly [sic] that she was a little groggy" (Exhibit 4F).   An August 3, 2009, letter from Nancy Detweiler, LCSW, to Santa Fe Community College stated the claimant's withdrawal from classes was due to PTSD.   However, the letter also stated, "We anticipate that she will do well in future courses and recommend that she be permitted to re-enroll for fall courses.   She is a very capable woman and deservices [sic] every opportunity to complete her education" (Exhibit 3F).   An August 3, 2009, entry noted the claimant "reported feeling better."   An August 26, 2009, entry noted the claimant was interested in seeking part-time employment and securing her own transportation prior to returning to community college.   On August 27, 2009, Ms. Detweiler noted the claimant reported an "improved relationship with [her] mother and brothers and [an] increased ability to set limits."   On September 1**,** 2009, Jeanne Duffin, ARNP, noted the claimant had called in distressed over the anniversary of losing her daughter.   The claimant was at her mother's house and it was noted that her mother and cousin had reached out to her (Exhibits 4F and SF).   A September 21, 2009, entry noted the claimant stated she was "doing well," that her relationship with her mother has improved, and that she sees friends.   A September 28, 2009, entry noted the claimant's speech and cognitive functioning were within normal limits.   The entry also noted Ms. Detweiler was going to look into a program to return her to work and

that the claimant "will always" keep her cable television.   Dr. Llinas concluded the claimant's GAF score was 60 (Exhibit 12F).

The claimant's treatment in 2010 and 2011 reveals the claimant's condition had improved to the point she was doing well with her family and in school.   A January 26, 2010, entry noted the claimant "is eager to get started with trying to find employment."   A January 27, 2010, entry noted the claimant "continues to fight depression but claims that she is dealing better with family's rejecting behavior than in the past."   A March 12, 2010, entry noted the claimant had "no-showed" four consecutive appointments with the Metabolic Monitoring Clinic.   A July 12, 2010, entry noted the claimant planned to resume business courses and that she "has been getting along well with her mother and the loan of a car is again being promised so that [the] veteran can attend class."   The entry also noted the claimant required a letter documenting her health problems and her need for a computer and printer.   A November 4, 2010, entry noted the claimant had thrown her mother a surprise birthday party with balloons and BBQ. A November 18, 2010, entry noted the claimant was close to finishing her first semester at school and continued to have good grades.   In addition, it also noted the claimant's relationship with her family had continued to improve.   A January 27, 2011, entry noted the claimant was planning a trip to Tampa with her mother to see the sights and stay at the Hard Rock Cafe.   The claimant's GPA from the previous semester was a 3.75 and noted she was attending all of her classes that began at 8 a.m.   It also noted the claimant was "somewhat" asocial but added she did attend some family functions (Exhibit 12F).   R. 14-16.

After considering this evidence and Plaintiff's testimony, R. 16-17, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms *are not credible* to the extent they are inconsistent with the above [RFC] assessment."   R.17 (emphasis added).   The ALJ gave several reasons for his RFC assessment, including consideration of Dr. Llinas' opinion.   R. 18, 486-89 (Dr. Llinas' September 28, 2009, report).   The ALJ rendered the following RFC for Plaintiff:

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform a full range of work at all exertional levels but with nonexertional limitations.   Specifically, the claimant is limited to simple, routine, repetitive tasks involving up to three-step commands.   The claimant is

further limited to work requiring only occasional changes in work setting and decision-making.   Lastly, the claimant is limited to work requiring only occasional interaction with the general public or co-workers.   R. 14.

At step 4, and based on the testimony of VE Mr. McKay[1] regarding Plaintiff's *past relevant work,* i.e., as a medical records clerk, payroll clerk, customer service representative, and receptionist, and his response to the first hypothetical question posed by the ALJ,[2]   R. 47-48, 234, the ALJ concluded that in comparing Plaintiff's RFC "with the mental demands of her past relevant work," Plaintiff "is *unable to perform it as actually and generally performed*" "based upon the record and testimony received at the hearing from [Plaintiff], her representative, and the vocational expert."   R. 19. (emphasis added).

At step 5, the ALJ determined that Plaintiff's "ability to perform work at all exertional levels has been compromised by nonexertional limitations.   To determine the extent to which these limitations erode the occupational base of *unskilled* work at all exertional levels," R. 20, the ALJ asked Mr. McKay a second hypothetical question, R. 48, to assist in determining whether there are jobs in the national economy that

---

[1]   After Plaintiff testified, R. 30-46, Mr. McKay testified without objection to his credentials.   R. 46-51.   Mr. McKay prepared a "work experience summary" of Plaintiff's prior work.   R. 47-48, 234.

[2]   After marking exhibit 16E, R. 234, the ALJ asked Mr. McKay the following question: "Please assume a hypothetical individual of the Claimant's age, education, and vocational background with nonexertional limitations.   However, this person would be limited to jobs involving occasional interaction with the general public and coworkers. Would this hypothetical person be capable of any of the *past work* that you've discussed, medical records clerk, payroll clerk, customer service rep, or receptionist?"   Mr. McKay responded: "I think that all of these jobs would be in some type of office setting and I think the, the contact with coworkers would normally be above occasional, one-third of the day." . . . "People are always around in an office (INAUDIBLE)."   R. 48.   (emphasis added).

Plaintiff can perform.   R. 19-20 (emphasis added).   This second hypothetical almost immediately followed the first hypothetical question and response.   R. 47-48.

Thus, the ALJ asked Mr. McKay the following question regarding *other work*, followed by several questions by the ALJ and Plaintiff's representative:

> Q: No, same one, no exertional limitations, limited to jobs involving simple routine repetitive tasks with up to three step demands, occasional changes in the work setting, judgment or decision making, and occasional interaction with the general public and coworkers.   Any other work existing in significant numbers in the national and Florida economies for this person?

> A: Yes, sir.   A *cleaner*, 323.687-014, light, SVP: 2, unskilled, 484,000 in the national economy, 12,200 in the state.   A *laundry sorter*, 361.687-014, light, SVP: 2, unskilled, 63,000 in the national economy, 1100 in the state.   And a *kitchen helper*, 318.687-010, medium, SVP: 2, unskilled, 454,000 in the national economy, 7300 and the state.

> Q: Is your testimony consistent with the Dictionary of Occupational Titles?

> A: Yes, sir, I believe it was.

> EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY

> Q: Mr. McKay, if we add to the hypotheticals a person who would have poor ability in concentration, and I'm relating poor to a marked inability.

> A: Yes, ma'am.

> Q: In addition, would not be in attendance at work two or three days a week.

> A: Okay.

> Q: Would that change your testimony at all?

> A: It would.   I don't think that a person would be able to hold a job with a marked limitation in concentration or--[3]

---

[3]   At this point, Mr. McKay agrees that the additional factors posed by Plaintiff's representative here and on the next two pages, and as clarified by the ALJ, would render Plaintiff unemployable.   For Plaintiff, the problem is not that there were insufficient facts posed to Mr. McKay during the hearing regarding the impact of alleged impairments on Plaintiff's ability to work.   Rather, the problem is that the ALJ ultimately rejected Plaintiff's

ALJ: Hold on a second.   You know, sometimes I really struggle with these. When you, when you use the forms from Social Security, which I know they have put marked, moderate, mild, those are really getting to whether there is a severe impairment or not, whether we have a listing, but they really don't get to the, the RFC, in other words, the restrictions that are work related restrictions.   So I, I, the, when you said absent two to three days per week, that one, that's a solid restriction.   I don't really know what a marked restriction in concentration means.

ATTY:   Your Honor, I believe the Social Security Administration determined it has no, no useful or seriously limited.

ALJ: Right.

ATTY: I would, once again, seriously limited, I mean, is that more than occasional, is that more than a third of the time, at least half of the time?

ALJ: Well, well, and I don't know and I think, I think Mr. McKay has probably already said, but the, with, with her being absent two or three days a week, that's enough by itself just, and I understand that.

ATTY: Yes, sir.

ALJ: So now I would just suggest that, that if you, if, if you're only going to say a moderate or a marked restriction, that's really open to interpretation so I would, I would recommend trying to put that in, in a more specific vocational term.

ATTY: To, to define or so –

ALJ: Now, for example, you'll notice when I asked the hypothetical question, you know, maybe I would say, you know, limited to jobs involving only, or no changes in the work setting, no judgment or decision making, maybe no production rate for work.

ATTY: Yes, sir.

ALJ: And maybe a need to be reminded of tasks a certain number of times per day.   Do you see what I'm saying there?

ATTY: Yes, sir.

assertions of being so limited when considering whether Plaintiff could perform jobs in the national economy.

ALJ: That gives a specific vocational restriction and that's, that's all I was saying.

ATTY: Yes, Your honor.

ALJ: But, I think the answer to your question, Mr. McKay is that person would be unemployable, is that right?

CLMT [sic]: Just based on the absentee limitation he would not be employable. [*See* n. 3, *supra*]

ALJ: Sure, I understand, all right.   And is that really, Ms. Dunmore, is that your theory of this case that, that, that she would be absent from work and that she'd be unable to work?

ATTY: It is, Your Honor.   The, the decompensation over time, Your Honor.   I think she had, based upon her testimony regarding her work history, based upon her testimony regarding her school record and attendance, attending classes, and based on her daily activities, Your Honor.

ALJ: My biggest concern about Ms. Washington is the fact that it's kind of, it's a little inconsistent that she's going to school.   You know, I don't see that very often.   And, obviously, that's to her credit and I appreciate the fact that she's trying to better herself.   But how, you know, the question would be then how is that consistent with a finding of disability?

ATTY: Your Honor, we would argue that it's, it would be equivalent to part-time work, Your Honor.   She's testified that she's supposed to be in class four days a week.   She doesn't.   She shows up about half the time, so she's in attendance about half the time.   I believe we would equivalate [sic], or equate that to, to part-time work, Your Honor, just not being able to show up the full eight hours a day, five days a week that would lead to the, the decompensation.   Your Honor, we lost you....

ALJ: So I see in the spring of 2009, it looks like she has one class, a three hour course.   No, I'm sorry, maybe it's a four hour course.   That was in prep read one, I'm not sure what that means, she got a B in that.

ATTY: Correct.

ALJ: And in the summer of 2009, we got a writing class, I see a W, I think that means withdraw.   And then I also see a prep pre-algebra class, another W, withdraw.   And it looks like the other class that she had was, I can't tell if that's an F or and I, I can't really tell but--

ATTY: That's an F, Your Honor.

ALJ: --yeah, it must be an F because there was zero credits.   So then the only semester that we have, that was the fall of 2010, she did get a 3.75.   That was based on a B plus in the prep reading class.

ATTY: And I believe one withdrawal there as well, Your Honor.   R. 48-52.   *See also* R. 232-33 for a copy of Plaintiff's courses and grades.

Thereafter, there was a brief discussion between the ALJ and Plaintiff regarding Plaintiff's current school semester, R. 53, followed by a summation by Plaintiff's representative:

ATTY: Yes, Your Honor.   Your Honor, we would also offer that because we are looking at such a young person who is obviously, I think based upon her work history, Your Honor, and her current effort to, to better herself, Your Honor, this may be a case that should be reviewed, I don't even know if you'd want to extend it for a three year period, Your Honor.   But with her now receiving continuous counseling at the VA, in addition to the counselor coming to her home, in addition to trying to complete her case work, or course work at school, it may be a case, Your Honor, a person who would be on benefits for a short period of time to try to maintain some level of functioning, Your Honor, and then up for review.

ALJ:   All right, I appreciate that.   All right, I'll take that into consideration.…

R. 54.

In his Decision, the ALJ completed his assessment at step five, and concluded: "Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and [RFC], the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.   A finding of 'not disabled' is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines."   R. 20.

## VI.  Legal analysis

Plaintiff argues that the ALJ erred in determining her mental RFC.   Doc. 11 at

9-14.   Specifically, Plaintiff contends that the ALJ failed to consider her impairments in

combination, and failed to include all the Psychiatric Review Technique (PRT) limitation

findings, including *moderate* limitations in maintaining social functioning and

maintaining concentration, persistence, and pace, in his RFC finding and failed to

include these impairments in a hypothetical question posed to Mr. McKay based on that

finding.

Defendant argues that the ALJ's RFC determination of Plaintiff and the

hypothetical question posed to Mr. McKay were consistent with the record and

demonstrated that Plaintiff could perform three unskilled jobs.   R. 20.   Defendant also

argues that the ALJ's mental RFC was sufficient because it accounted for all of

Plaintiff's credibly-established limitations.

In Winschel v. Astrue, 631 F.3d 1176 (11th Cir. 2011), the Eleventh Circuit held

that the ALJ erred with respect to that case because the ALJ did not include in the

hypothetical question to the VE that the claimant had moderate limitation in

concentration, persistence, or pace, as found by the ALJ at step two of the sequential

process.   *Id.,* at 1181.   The Eleventh Circuit ruled in this manner not because the

ALJ's two-step moderate limitation in concentration, persistence, or pace finding must

always be included in the RFC or hypothetical question based on that RFC, as

suggested by Plaintiff.   Doc. 11 at 14.   Instead, the Eleventh Circuit reached its

conclusion in Winschel because the ALJ failed to adequately explain how the medical

evidence showed that the claimant could still perform the mental tasks of work despite

his moderate limitation in concentration, persistence, or pace.   Winschel, 631 F.3d at 1181.   "But the ALJ did not indicate that medical evidence suggested Winschel's ability to work was unaffected by this limitation, nor did he otherwise *implicitly* account for the limitation in the hypothetical.   Consequently, the ALJ should have explicitly included the limitation in his hypothetical question to the" VE.   *Id.*   (emphasis added).[4]

Here, the ALJ properly incorporated his findings into his RFC by limiting Plaintiff to simple, routine, repetitive work involving up to three-step commands; work requiring only occasional changes in work setting and decision making; and work requiring only occasional interaction with the general public or co-workers.   R. 14, 48-49.   The ALJ properly set forth the *credible difficulties or limitations* that flowed from his step-two evaluation of Plaintiff's mental impairments.

As discussed herein at section V., *see* pages 8-10, *supra*, and to a limited extent below, the ALJ also explained in his Decision how the evidence, including the medical evidence, showed that Plaintiff could perform the mental tasks set forth in his RFC determination.   In short, the ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms." However, the ALJ, based on the credible medical and other evidence of record, found that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms" were not credible.   R. 17.

---

[4]   "Other circuits have also rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work. . . .   But when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations."   *Id.*, at 1180 (citations omitted).

The ALJ thoroughly analyzed Plaintiff's longitudinal treatments records, which support his RFC findings and are inconsistent with Plaintiff's alleged degree of limitation.

The ALJ's discussion begins with Plaintiff's sexual abuse as a child, abuse in high school, followed by sexual battery while employed in the Army, followed by an encounter with sexual harassment during recent employment.   R. 14.   The discussion of Plaintiff's treatment begins in and around 2007 with progress note entries by the Veterans Administration staff.   *Id.*

In August 2008, Billie M. Warren, Ph.D., examined Plaintiff and found that she had normal remote and immediate memory, average intelligence, only mildly impaired recent memory, no problems with daily living activities, and unremarkable thought processes with a GAF score for PTSD of 60.   R. 15, 340-50.   *See also* R. 15, 255, 365-66, 375-76 for treatment records for early to mid 2009 including GAF scores of 62 and 69.

Treatment notes from the spring to the fall of 2009 reveal that Plaintiff was diagnosed with moderate depression.   In June 2009, Plaintiff dropped her summer classes although she planned to reenroll in school in the fall, had paid work experience at the VA, and looked forward to this.   R. 370-71.   Jose Llinas, M.D., concluded that Plaintiff's GAF score was 69, but labeled this "moderate to severe symptoms," although an entry later that month, noted that Plaintiff was in good spirits, in control, and much improved from her depression.   R. 15, 361, 366.   In August 2009, Ms. Detweiler, in a letter to Santa Fe Community College, stated that Plaintiff's withdrawal from classes was due to PTSD.   R. 490.   On the same date of this letter, Plaintiff reported feeling

better.   R. 15, 359.   Toward the end of August 2009, Plaintiff was alert, oriented,

coherent, and organized with a stable mood.   R. 353.   Plaintiff reported an improved

relationship with her mother and brothers.   R. 353-54.   In September 2009, it was

noted that Plaintiff's speech and cognitive functioning were within normal limits and, as

noted by Ms. Detweiler, Plaintiff is going to look into a program to return her to work.

R. 562.   Dr. Llinas concluded Plaintiff's GAF score was 60.   R. 562.

     Plaintiff showed continued improvement in control of her symptoms in 2010 and

2011.   R. 16-18.   In January 2010, Plaintiff stated that she was "eager to get started

with trying to find employment."   R. 16, 556.   Later that year, Plaintiff reported that her

relationship with her family continued to improve.   R. 16, 516, 554.   In January of

2011, an entry noted that Plaintiff was planning a trip to Tampa with her mother to see

the sights and stay at the Hard Rock Café.   It was noted that Plaintiff remained

"somewhat asocial," but did attend some friend and family functions.   R. 16, 513.

     The ALJ also discussed Plaintiff's activities of daily living including cooking,

maintaining her household, cleaning, doing laundry, shopping, driving, paying bills,

watching television, and attending classes at Santa Fe Community College.   R. 13,

16-17, 31, 39-43, 185-87, 270, 325, 441, 505, 513, 515-17, 540-41.   *See also*

R. 232-33 for a copy of Plaintiff's grades, which indicate some poor grades interspersed

with some better grades, but also a 3.75 average for two classes ("prep pre-algebra"

and "prep read 2", one withdrawal ("pc basics") for the fall 2010 semester and that she

enrolled for the spring 2011 semester.   *See also* R. 52-53.

The foregoing is a brief summary of some of the evidence considered by the ALJ.   He also discussed Plaintiff's testimony during the hearing.   R. 16-17.   *See also* pp. 8-10, *supra*.

After considering the material medical and other evidence of record, the ALJ provided several reasons why the evidence supported his RFC assessment, including the extent of Plaintiff's daily activities; Plaintiff's receipt of unemployment benefits after the alleged onset date, which he found to be inconsistent with a claim of total disability; Plaintiff's current progress in school and post-graduation plans; Plaintiff's improvement in her social relationships; Plaintiff's use of medications, which help to alleviate her symptoms; and the "routine and conservative" nature of Plaintiff's treatment regime "focused on outpatient counseling and prescription medication."   R. 17-18.

The ALJ also considered and rejected the opinion of Dr. Llinas rendered on September 28, 2009, in which Dr. Llinas concluded that Plaintiff was not able to work at this time, in part, due to difficulties concentrating.   R. 18, 487.   The ALJ found that "the medical record throughout the period under review reveals the claimant is capable of numerous daily living activities, ability to complete school courses, and all other credibility factors contradict Dr. Llinas' opinion."   R. 18.   The ALJ also noted "the extensive treatment records since the date of Dr. Llinas' opinion that are inconsistent with that opinion."   *Id.*

The record as a whole supports the ALJ determination that Plaintiff has the mental RFC to perform work involving simple, routine, repetitive tasks with up to three-step commands; occasional changes in work setting and decision making; and occasional interaction with the general public or coworkers.   R. 14.   The medical

evidence supported the ALJ's RFC determination and the ALJ appropriately accounted for Plaintiff's proven limitations.

After determining that Plaintiff's RFC prevented the performance of her past relevant work, the ALJ acknowledged that the burden shifted to the Commissioner at step five of the sequential evaluation process, to produce evidence of other work existing in significant numbers in the national economy that Plaintiff can perform based on her age, education, work experience, and RFC.   R. 19.   In order to meet the Commissioner's burden, the ALJ properly utilized the vocational expert testimony of Mr. McKay.   R. 20, 47.   The hypothetical question posed to Mr. McKay was consistent with the ALJ's findings based on the medical and other evidence of record.   Plaintiff has not demonstrated that the ALJ erred in posing this hypothetical question to Mr. McKay.   *See also* n. 3, *supra.*

The vocational expert is a specialist in employment and vocational factors influencing employment.   *See* Phillips v. Barnhart, 357 F.3d at 1240.   "Because the hypothetical was adequate, the vocational expert's testimony was reliable to establish that there are jobs that [Plaintiff] can perform that exist in significant numbers within the regional and national economies."   Gragg v. Astrue, 615 F.3d 932, 941 (8th Cir. 2010).

In light of establish precedent, and in light of the expert opinion rendered by Mr. McKay, the ALJ did not err in determining that Plaintiff would be able to perform several unskilled jobs such as a cleaner, laundry sorter, and kitchen helper.   R. 20. As a result, the ALJ did not err in determining that Plaintiff retained the ability to perform other work and was, therefore, not under a disability as defined in the Social Security

Act.   The ALJ decision is supported by substantial evidence and he appropriately applied controlling law.

**VII.   Conclusion**

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.   Accordingly, pursuant to 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for the Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on May 29, 2012.

s/   Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**